J-S43014-25
J-S43015-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: S.H.A., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: K.L.A., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1942 EDA 2025 |

Appeal from the Decree Entered July 8, 2025
In the Court of Common Pleas of Lehigh County Orphans' Court at No(s):
A2025-0007

| | | |
|---|---|---|
| IN RE: S.H.A., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: A.T.A., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1997 EDA 2025 |

Appeal from the Decree Entered July 8, 2025
In the Court of Common Pleas of Lehigh County Orphans' Court at No(s):
A2025-0007

BEFORE:  KUNSELMAN, J., McLAUGHLIN, J., and BENDER, P.J.E.

MEMORANDUM BY KUNSELMAN, J.:                **FILED FEBRUARY 11, 2026**

In these matters, K.L.A. (Mother) and A.T.A. (Father) appeal from the decrees that terminated their parental rights to their now over two-year-old son, S.H.A. (the Child or Child), pursuant to the Adoption Act.  *See* 23 Pa.C.S.A. § 2511(a)(1), (a)(2), (a)(5), (a)(8), and (b).  Because each parent's appeal raises substantially the same issues and involves the same facts and

circumstances, we address the parents' appeals together in one decision. After review, we affirm.

We discern the following factual and procedural history from the orphans' court's opinion. In October 2023, while Mother was pregnant with the Child, Mother and Father traveled from Lehigh County to Philadelphia to buy illegal drugs. On the way, Mother went into labor and had an emergency c-section in Philadelphia.

At his birth, the Child and Mother tested positive for several illicit substances. Mother told medical staff she had been using two to three bags of heroin daily, which was a reduction due to her concern that the drugs would impact the Child. Mother was fearful that if she went through withdrawal while pregnant, the Child would suffer. Within a few days after his birth, it became obvious that the Child was drug-impacted. He was placed in the NICU. While the Child was hospitalized, Mother and Father visited him only a handful of times, with the last visit being on October 24, 2023. Conversely, a foster family began visiting the Child daily. The Child was discharged into the foster family's care in November 2023, five and a half weeks after he was born, and he has remained there ever since.

The Child was adjudicated dependent. Mother's court-ordered recommendations included: submitting urinalysis to show sobriety as recommended by the Lehigh County Office of Children and Youth Services (the Agency); completing a drug and alcohol evaluation and any treatment recommended; and obtaining and maintaining legal income and stable

housing. Father's court-ordered recommendations included: submitting urinalysis to show sobriety as recommended by the Agency; obtaining and maintaining legal income and stable housing; and notifying the Agency of any changes in his address or contact information.

Over the next fourteen months, Mother and Father failed to comply with their court-ordered recommendations and did not maintain contact with the Agency or the Child. On February 7, 2025, the Agency filed petitions to involuntarily terminate Mother's and Father's parental rights. The orphans' court held a termination hearing on April 23, 2025.[1] Two Agency caseworkers,

_____

[1] The Child was represented by counsel at the termination hearing who also served as the Child's guardian *ad litem* (GAL) in the dependency proceedings.

Our Supreme Court has mandated that appellate courts *sua sponte* "verify that the orphans' court indicated that the attorney [in a dual role of GAL and legal counsel] could represent the child's best interests and legal interests without conflict." **In re Adoption of K.M.G.**, 240 A.3d 1218, 1236 (Pa. 2020); **see also** 23 Pa.C.S.A. § 2313(a). Counsel representing a child's legal interests must advocate for the child's preferred outcome even if counsel does not agree with it, whereas the GAL representing a child's best interests must express what the GAL "believes is best for the child's care, protection, safety, and wholesome physical and mental development regardless of whether the child agrees." **In re T.S.**, 192 A.3d 1080, 1082 n.2 (Pa. 2018) (citation omitted).

Here, the record does not contain clear findings by the trial court regarding whether a conflict existed between the Child's legal and best interests. However, the Child was a little over a year and a half old at the time of the termination hearing, and there is record evidence that he was still learning to speak and had a limited vocabulary. **See** N.T., 4/23/25, at 68, 75, 77, 81; Recommendations – Permanency Review, 3/19/24, 9/12/24, 2/25/25 (noting that the Child was too young to express his views). Given the Child's young age and his stage of development, it would have been impossible to ascertain
*(Footnote Continued Next Page)*

- 3 -

a foster care adoption case manager, and Mother testified. On July 8, 2025, the orphans' court involuntarily terminated Mother's and Father's parental rights to the Child.

Mother and Father timely filed these appeals. We will address Mother's appeal first. Mother presents the following two issues[2] for our review:

_____

his preferred outcome. Thus, there could not have been a conflict between the Child's interests, and dual representation was appropriate. **See T.S.**, 192 A.3d at 1088 (recognizing that "where a child is too young to express a preference, it would be appropriate for the GAL to represent the child's best and legal interests simultaneously." (citation omitted)).

Nevertheless, we remind the orphans' court and all counsel that the orphans' court is required to determine whether counsel can represent the dual interests of a child **before** appointing an individual to serve as GAL/counsel for the child. **See K.M.G., supra.** The orphans' court is not permitted to delegate this responsibility to counsel. **See Matter of Adoption of A. C. M.**, 333 A.3d 704, 708-09 (Pa. Super. 2025). As a best practice, when a child is too young to express a preference, the orphans' court should indicate this in the order appointing the GAL as the child's legal counsel for the termination proceeding.

[2] Mother's Appellate Rule 1925(b) statement raises approximately six issues, none of which directly match the issues she lists in her brief. **See** Mother's Concise Statement of Matters Complained of on Appeal. Two of her issues broadly challenge the termination by stating that it was not supported by sufficient evidence and that the Agency had not met its burden of proof. **See id.** Although her next three issues do not specifically cite which statutory subsections she is challenging, we surmise from the language used that they refer to Section 2511(a)(2), (5), and (8). **See id.** Mother's sixth issue cites Section 2511(a)(8) and (b). **See id.** However, none of Mother's issues specifically cite Section 2511(a)(1) or use the language from that subsection. **See id.**

We remind and caution Mother and her counsel that, pursuant to Appellate Rule 1925(b), issues "not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived." Pa.R.A.P.

*(Footnote Continued Next Page)*

1. Did the trial court err as a matter of law and/or abuse its discretion in finding that the Lehigh County Office of Children and Youth Services met the requirements of 23 Pa.C.S.A. §2511(a)(1), (a)(2), (a)(5) and (a)(8) by clear and convincing evidence?

2. Did the trial court err as a matter of law and/or abuse its discretion in finding that the Lehigh County Office of Children and Youth Services sustained their burden of proof by clear and convincing evidence that the termination of biological parent's' parental rights to [the Child] best met the needs and welfare of the Child as required by 23 Pa.C.S.A. §2511(b)?

Mother's Brief at 4 (cleaned up) (numbering added) (excess capitalization and suggested answers omitted).

We begin with our well-settled standard of review:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

_____

1925(b)(4)(vii). Nevertheless, because a challenge to (a)(1) is derivative of the broader issues included in her concise statement, our appellate review was not impeded. Thus, we decline to find waiver in this instance.

- 5 -

Our Supreme Court has repeatedly stated that in termination cases, deference to the trial court is particularly crucial. *In re Adoption of L.A.K.*, 265 A.3d 580, 597 (Pa. 2021); *see also Interest of S.K.L.R.*, 256 A.3d 1108, 1124 (Pa. 2021) ("When a trial court makes a 'close call' in a fact-intensive case involving . . . the termination of parental rights, the appellate court should review the record for an abuse of discretion and for whether evidence supports that trial court's conclusions; the appellate court should not search the record for contrary conclusions or substitute its judgment for that of the trial court."). The abuse-of-discretion standard in termination cases "is a highly deferential standard and, to the extent that the record supports the court's decision, we must affirm even though evidence exists that would also support a contrary determination." *In re P.Z.*, 113 A.3d 840, 849 (Pa. Super. 2015) (citation omitted); *see also T.S.M.*, 71 A.3d at 267. Furthermore, the "trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted).

Clear and convincing evidence is evidence that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (quoting *Matter of Adoption of Charles E.D.M., II*, 708 A.2d 88, 91 (Pa. 1998)).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child . . . .

*In re C.M.K.*, 203 A.3d 258, 261-62 (Pa. Super. 2019) (citation omitted); *see also Interest of M.E.*, 283 A.3d 820, 830 (Pa. Super. 2022).

Instantly, the orphans' court terminated Mother's rights under Section 2511(a)(1), (a)(2), (a)(5), (a)(8), and (b). As we may affirm under any of the subsections of Section 2511(a), we review the court's decision as to Section 2511(a)(1). That subsection provides:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

23 Pa.C.S.A. § 2511(a)(1).

Here, the termination petitions were filed on February 7, 2025; thus, the statutory timeframe to examine Mother's actions began on August 7, 2024. Our Supreme Court has reinforced "the view that the six-month period

immediately preceding the filing of the petition is the ***most*** critical period to evaluate for affirmative conduct or its absence . . . ." ***In re Adoption of C.M.***, 255 A.3d 343, 367 (Pa. 2021) (citation omitted) (some emphasis in original). "The trial court must examine the individual circumstances of each case and consider all of the explanations of the parent to decide if the evidence, under the totality of the circumstances, requires involuntary termination." ***In re I.J.***, 972 A.2d 5, 10 (Pa. Super. 2009) (citing ***In re B.,N.M.***, 856 A.2d 847, 855 (Pa. Super. 2004), *appeal denied*, 872 A.2d 1200 (Pa. 2005)).

Regarding parental duties, we have explained that:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, . . . the parental obligation is a positive duty which requires affirmative performance.

***B.,N.M.***, 856 A.2d at 855 (citation omitted).

Furthermore,

> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with [the child's] physical and emotional needs.

***Id.*** (internal citations omitted).

Once a settled purpose of relinquishing parental rights or a failure to perform parental duties is established, "the court must engage in three lines of inquiry: (1) the parent's explanation for [the parent's] conduct; (2) the post-abandonment contact between [the] parent and [the] child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b)." ***In re Z.S.W.***, 946 A.2d 726, 730 (Pa. Super. 2008) (citing ***Charles E.D.M., II***, 708 A.2d at 92).

Here, the orphans' court determined that the Agency had proven the statutory grounds for terminating Mother's parental rights under Section 2511(a)(1). The court explained:

> Addiction played the predominant role in guiding both parents' behavior for the first 17 months of Child's life. He was adjudicated dependent following a hearing held November 7, 2023, which they did not attend. They did not attend any of the dependency hearings pertaining to Child or try to comply with [any] of the court-ordered services the Juvenile Division set forth to help Mother and Father reunify with Child. After their last visit with Child on October 24, 2023, at the NICU in Philadelphia, they did not visit Child at all. They did not contact [the Agency] to find out how Child was doing, except that on March 25, 2024, Mother reached out to [. . .] the original [Agency] caseworker in the matter, and provided updated contact information for herself and Father. [The original caseworker passed that information to the new caseworker, who immediately reached back out to Mother. Mother provided updated contact information for herself and Father. The caseworker attempted to engage Mother in services, but after the caseworker let Mother know what was expected of her and that Mother could visit with the Child, Mother did not respond.] [. . .] Neither parent responded to subsequent attempts [the caseworker] made to contact the parents, whether by phone, mail, or text.

- 9 -

On or about September 3, 2024, the Juvenile Division granted the Agency's petition for a finding of aggravated circumstances based on the parents' failure to maintain contact with Child for a period of six months. On March 5, 2025, nearly a year after her last contact with the Agency, Mother contacted the Agency for the second time since Child went into the Agency's care. She provided her current contact information at the recovery house and requested visits with Child. [The caseworker] then reached out to Father using new contact information Mother had provided to ask if he would like visits as well.

[The caseworker] scheduled visits for Mother and for Father to occur on March 19, 2025. Child was 17 months old at the time and it would be the first time either parent had seen him since October 24, 2023. Mother attended the visit, but Father failed to confirm the visit as required and was unable to attend. Notably, Child clung to his foster father at the start of the visit. During the visit, Mother was appropriate with Child and spoke to him throughout the visit. He reacted to Mother the same way he does to complete strangers: Rather than playfully initiating, as he does when he is with people whom he knows and with whom he is comfortable, he kept to himself or responded to Mother's initiation of play.

Another visit was scheduled for Father for April [15], 2025, but it had to be cancelled because Child was sick. As of the date of the termination hearing, Mother had two supervised hour-long visits with Child. Father had not seen Child at all.

The [orphans' court] recognizes that Mother has recently made progress, but the Agency's petition to terminate Mother's and Father's parental rights pursuant to 23 Pa.C.S. §2511(a)(1), (2), (5), and (8) is nevertheless well-founded and should be granted. Child has been continuously in placement since November 7, 2023. From October 24, 2023, (the parents' last visit with Child at the Temple University Hospital) until approximately two months before the termination hearing, neither parent showed any interest in performing parental duties or taking the steps necessary to provide Child with the essential parental care, control, or

J-S43014-25
J-S43015-25

subsistence he needs for his physical and mental wellbeing. (***See*** 23 Pa.C.S. §2511(a)(1) and (2).) In addition, they exhibited an apparent "settled purpose of relinquishing parental claim to [their] child" for a period in excess of six months by their failure to have any involvement with Child or with the Agency regarding Child. (23 Pa.C.S §2511(a)(1).)[FN 5]

> FN 5 Neither parent contacted the Agency for nearly a year, between Mother's March 25, 2024, phone contact and her March 5, 2025, phone contact. Father apparently never tried to reach the Agency. Mother testified that she tried to reach [the caseworker] in January of 2025 while her inpatient counselor was with her but that she was unsuccessful. The only contact from Child's parents that [the caseworker] described was a phone call in January [2025] that was actually from a case manager at Pyramid's inpatient center at Langhorne. The individual called [the caseworker] to notify her that each of the parents had been in the hospital for more than a month due to an overdose. (Mother indicated during her testimony that there never was an overdose; rather, the parents were detoxing as previously described.) The case manager further conveyed that Father's mother had received a letter giving Father notice of a permanency review hearing scheduled in February and she was requesting a continuance of the hearing. However, the [orphans' court] notes that neither parent responded to attempts the Agency made by phone call, text, email, or regular mail to contact Mother and/or Father regarding Child after Child was placed in the Agency's care on November 7, 2023.

Orphans' Court Opinion (O.C.O.), 7/8/25, at 4-6 (some footnotes omitted).

On appeal, relevant to (a)(1),[3] Mother argues that because she did not have physical custody of the Child since removal and was limited to only supervised contact with the Child, "she did not truly have the opportunity after adjudication to provide ongoing, consistent parental care" to the Child. Mother's Brief at 13. Therefore, she did not fail or refuse to provide ongoing, consistent parental care to the Child. *See id.* She also "had certainly not evidenced any settled purpose of relinquishing her rights" to the Child. *Id.* Mother also claims that this Court must consider all her circumstances which were largely beyond her control. *See id.* at 14. According to Mother, her efforts to remain in contact with the Child were never made easier by the Agency. *Id.* Thus, Mother reiterates that she did not evidence a settled purpose to relinquish her parental rights to the Child, nor did she intentionally fail to parent him. *Id.* She claims she could not parent the Child because the dependency court removed him from her care and placed him into foster care. *Id.*

_____

[3] In her brief, although Mother utilizes some of the language from Section 2511(a)(1), she fails to clearly delineate which parts of her argument relate to (a)(1). Thus, we would have cause to find Mother's first issue waived due to lack of proper development. *See, e.g., In re M.Z.T.M.W.*, 163 A.3d 462, 465 (Pa. Super. 2017) ("It is well-settled that this Court will not review a claim unless it is developed in the argument section of an appellant's brief, and supported by citations to relevant authority." (citation omitted)). Nevertheless, we decline to do so, and instead only address Mother's arguments that relate to a Section 2511(a)(1) analysis.

Our review of the record supports the orphans' court's decision and belies Mother's arguments. In the six-month statutory period (August 2024 to February 2025), Mother never contacted the Agency about her reunification goals or the Child. *See* N.T., 4/23/25, at 41, 43, 45, 48. Mother never visited with the Child during that period. *See id.* at 45. Mother did not attend the Child's adjudication hearing or any permanency review hearings. *See id.* at 13, 32, 37, 43, 120. The permanency review orders entered in this case found that Mother had no compliance with the permanency plan and had made no progress toward alleviating the circumstances which necessitated the original placement. *See* Recommendations – Permanency Review, 3/19/24, 9/12/24, 2/25/25. In fact, aggravated circumstances were granted for both parents in September 2024 because they had no contact with the Child for six months. *See* N.T. at 43.

Additionally, Mother did not comply with any of her court-ordered recommendations. She did not submit urine screens. *Id.* at 33, 38, 44, 48. She did not complete a drug and alcohol evaluation or follow through with its recommendations. *Id.* at 33, 38, 44-45. The Agency could not confirm if Mother had stable housing or income or refer her to services because Mother had no contact with the Agency. *See id.* at 35, 41, 45, 48.

Essentially, Mother did absolutely nothing during the six-month period. She did not visit or have any contact with the Child, and she never even reached out to the Agency to ask about him. Although Mother testified at the

termination hearing that she went into detox in December 2024 followed by inpatient and outpatient treatment, Mother did not reach out to the Agency again until March 5, 2025. *See id.* at 49, 101-03. The caseworker was unaware that Mother had entered a detox facility, had completed inpatient treatment, or was in a recovery house until Mother contacted the Agency in March. *See id.* at 55-57. Therefore, at the February 2025 permanency review hearing, Mother's progress was unknown because she had not contacted the Agency. *See id.* at 57.

Further, Section 2511(b) makes clear that, with "respect to any petition filed pursuant to subsection (a)(1), (6), or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S.A. § 2511(b). Thus, Mother's contact with the Agency on March 5, 2025, the first time the Agency had heard from her since March 25, 2024, cannot be considered because it occurred after the termination petition was filed on February 7, 2025. *See id.*; N.T. at 48-49. Additionally, the Agency did not learn about any of Mother's treatment until she finally reached out in March 2025, after the termination petition had already been filed. Related to post-abandonment contact, Mother's two subsequent visits with the Child after she contacted the Agency in March 2025 also cannot be considered, because they occurred post-termination petition. *See* 23 Pa.C.S.A. § 2511(b). Moreover, Mother admitted at the termination hearing that she could not have

the Child with her where she was currently residing, and she had only secured a job the week before the hearing. *See* N.T. at 106-07, 26.

Like the orphans' court, we acknowledge that Mother has made some recent progress with receiving treatment and beginning to visit the Child. However, that does not negate the extended period that the Child was in placement before the termination petition was filed (from November 2023 to February 2025), during which Mother only contacted the Agency once (in March 2024) and never had contact with the Child. Further, we acknowledge that Mother testified that she attempted to contact the caseworker with her counselor in January 2025 and did not receive a response. *See id.* at 122-24. However, the orphans' court noted that neither parent responded to the Agency's attempts by phone call, text, email, or regular mail to contact them regarding the Child. O.C.O. at 6 n.5. We reiterate that the orphans' court was free to believe all, part, or none of the evidence presented, and to make credibility determinations and resolve conflicts in the evidence. *See M.G., supra.*

Lastly, Mother testified at the termination hearing that she felt she needed to stay away from the Child until she was clean and sober. *See* N.T. at 100, 120, 134-35. Although we commend Mother for the effort she has made in becoming sober, we reiterate that "the parental obligation is a positive duty which requires affirmative performance." *B.,N.M.*, 856 A.2d at 855 (citation omitted). "Parental rights are not preserved by waiting for a

- 15 -

more suitable or convenient time to perform one's parental responsibilities while others provide the child with [the child's] physical and emotional needs." *Id.* (citation omitted). As the orphans' court cogently explained, during "this 17-month period in which his parents were mostly or completely absent, a foster family stepped in to fulfill the parental role that was otherwise missing for this little boy." O.C.O. at 7. Under the totality of the circumstances, Mother's explanation for her conduct does not excuse her complete absence from the Child's life until after the termination petition was filed.

Thus, there was competent evidence to support the orphans' court's conclusion that Mother evidenced a settled purpose of relinquishing her parental claim to the Child or refused or failed to perform parental duties for the six-month statutory period. *See Interest of A.M.*, 256 A.3d 1263, 1270–71 (Pa. Super. 2021) (noting that "where a child is in foster care, a parent has the affirmative duty to work towards the return of the child by cooperating with the Agency to obtain the rehabilitative services necessary for her to be capable of performing her parental duties and responsibilities." (citation omitted)). We discern no error of law or abuse of discretion with the orphans' court's decision under Section 2511(a)(1).

Mother's second issue challenges the orphans' court's findings under Section 2511(b), the second part of the bifurcated analysis in termination of parental rights cases. Section 2511(b) provides:

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the

developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S.A. § 2511(b).

The "determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis," but "courts should consider the matter from the child's perspective, placing [the child's] developmental, physical, and emotional needs and welfare above concerns for the parent." *In the Interest of K.T.*, 296 A.3d 1085, 1105 (Pa. 2023) (citations omitted); *see also C.M.K.*, 203 A.3d at 261-62 (the focus of Section 2511(a) is the conduct of the parent, whereas the focus of Section 2511(b) is the best interests of the child) (citation omitted).

"The plain language of Section 2511(b) clearly mandates that, in assessing the petition to terminate parental rights, the 'primary consideration' must be the child's 'developmental, physical and emotional needs and welfare.'" *K.T.*, 296 A.3d at 1105. It is well-established that the child's "emotional needs" and "welfare" include "intangibles such as love, comfort, security, and stability." *Id.* at 1106 (citing *T.S.M.*, 71 A.3d at 267). Our Supreme Court also requires courts to consider, not only whether the children have a bond with their biological parent, but also whether the children are in a pre-adoptive foster home and whether they have a bond with their foster

parents. *Id.* (citing *T.S.M.*, 71 A.3d at 268; *In re D.C.D.*, 105 A.3d 662, 677
(Pa. 2014)).

Here, the orphans' court concluded that terminating Mother's parental
rights best served the Child's needs and welfare. The court explained:

> Child has been in the home of Kinship Parents since
> November 8, 2023, and has been outside of the parents'
> care since his birth. Mother and Father had just four or five
> visits with Child during the first month of his life. Recent
> attempts to establish visitation confirmed that Mother is
> essentially a stranger to Child and that he has no bond with
> her. He did not have a name for Mother, but he calls his
> foster parents "Mommy" and "Daddy." In light of Child's
> very young age and Father's failure to see the [C]hild at all
> since October of 2023, it is hard for [the orphans' court] to
> imagine that Child has any bond with Father, either.
>
> In contrast, Child had regular ongoing contact with the
> foster family before he was placed with them, and he has
> lived with them continuously since placement. By all
> accounts, he is well-adjusted and happy, closely bonded to
> all members of the family, and really is a family member in
> the foster family. All of his day-to-day needs, medical
> needs, and developmental needs are consistently met by his
> foster family. They advocated for him to receive physical
> therapy (PT) when they noticed that his neck and core
> muscles appeared weak. They ensured he attended PT from
> January to July of 2024, and they followed through with the
> recommended exercises until he completed all
> recommended therapy. They promote frequent sibling visits
> between Child and his brother S., who is in the legal custody
> of S.'s great aunt and uncle.[4] Child's foster parents
> consistently meet all of his physical, medical, and emotional
> needs. He is spontaneously affectionate with them,

_____

[4] Here, the trial court noted Mother and Father have another son together, the
Child's older brother, S. *See* N.T. at 21-22, 40. The brother does not reside
with either Mother or Father and was not involved in this appeal. *See id.* at
40, 67-68, 116-17.

whereas he is guarded with others, including with his biological Mother.

Child needs and deserves stability, security, consistency, nurturance, and permanency. Each of these needs is ably met by his foster parents, with the exception of permanency. They want to give him permanency, as well, and plan to adopt him if parental rights are terminated. We therefore find it best serves Child's needs and welfare to terminate both parents' rights so that legal effect can be given to the relationship that already exists in fact between them.

O.C.O. at 8-9.

On appeal, Mother argues that separating the Child from her does not serve his needs. *See* Mother's Brief at 16. She claims that Section 2511(b) "specifically notes that factors 'beyond the control of the parent' may not be the sole basis for terminating parental rights." *Id.* Mother asserts that many of the barriers to her having custody of the Child were beyond her control, such as housing and substance abuse disorder which is a documented health condition. *Id.*

Mother's argument misapprehends the relevant law and is belied by the record. Specifically, a full reading of Section 2511(b) reveals that the "rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent." 23 Pa.C.S.A. § 2511(b). Contrary to Mother's argument, this section applies specifically to "environmental factors" that a court finds to be beyond the control of the parent. *See id.* However, the orphans' court did not terminate Mother's rights

- 19 -

based solely on factors such as inadequate housing, furnishings, income, clothing, or medical care, nor did the court find any of those factors to be beyond Mother's control. Instead, her decision to be absent from the Child's life until after the termination petition was filed, and to have nearly no contact with the Agency during the Child's placement, was within her control. We do not minimize the impact substance abuse can have on a parent, but courts "must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly." *K.T.*, 296 A.3d at 1108 (citing *T.S.M.*, 71 A.3d at 269) (emphasis omitted). Mother's argument is unavailing.

Further, Mother makes no cogent argument that she has any type of bond with the Child. Mother visited with the Child four times in October 2023 while he was in the hospital after being born. *See* N.T. at 15. Her next visit with the Child did not occur until March 2025, after the termination petition was filed. *See id.* at 49-50. By that time, the Child was seventeen-months old and had not seen Mother since he was less than a month old. He did not recognize Mother nor call her "mom." *See id.* at 60-61. The Child did not initiate interactions with Mother and initially clung to his foster father and the supervisor. *See id.* at 78. Thus, there was no evidence of any bond between Mother and the Child. *See In re Adoption of C.P.D.*, 324 A.3d 11, 27 (Pa. Super. 2024) ("In cases where there is no evidence of any bond between the

parent and child, it is reasonable to infer that no bond exists." (citation omitted)).

Conversely, the Child's foster family began visiting him while he was still in the hospital, and he has lived with them since he was released. *See* N.T. at 16, 28, 51, 73. The Child is now extremely bonded with his foster parents and foster siblings. *See id.* at 51-53, 74-76, 80. The Child's foster family takes care of all his needs and are an adoptive resource for him. *See id.* at 52-53, 76-77, 87. The Child refers to his foster parents as "mommy" and "daddy." *See id.* at 68, 77. The Child also has consistent visits with his older sibling. *See id.* at 40, 44, 67. The Agency caseworker testified that the Child needed permanency, and it was her opinion that parental rights should be terminated. *See id.* at 68-69. Similarly, the case manager recommended that the Child stay with his foster family. *See id.* at 80. Thus, the record supports the orphans' court's decision. We discern no error of law or abuse of discretion in the orphans' court's termination of Mother's parental rights under Section 2511(b).

We now address Father's appeal. Father presents the following two issues[5] for our review:

_____

[5] Father's Appellate Rule 1925(b) statement is identical to Mother's statement. Thus, our concerns with Mother's statement, as discussed in Footnote 2, apply equally to Father's statement, which also does not specifically address Section 2511(a)(1). As with Mother, we remind and caution Father and his counsel that issues "not included in the Statement and/or not raised in accordance
*(Footnote Continued Next Page)*

1. Did the trial court err as a matter of law and/or abuse its discretion in finding that the Lehigh County Office of Children and Youth Services met the requirements of 23 Pa.C.S.A. §2511(a)(1), (a)(2), (a)(5) and (a)(8) by clear and convincing evidence?

2. Did the trial court err as a matter of law and/or abuse its discretion in finding that the Lehigh County Office of Children and Youth Services sustained its burden of proof by clear and convincing evidence that the termination of biological parent's parental rights to [the Child] best met the needs and welfare of the Child as required by 23 Pa.C.S.A. §2511(b)?

Father's Brief at 4 (cleaned up) (numbering added) (excess capitalization and suggested answers omitted).

Instantly, the orphans' court terminated Father's rights under Section 2511(a)(1), (a)(2), (a)(5), (a)(8), and (b). Again, we may affirm under any subsection of Section 2511(a). Thus, we begin with our analysis of Section 2511(a)(1), incorporating our standard of review as described above.

On appeal, Father argues that the mere presence of substance abuse issues does not establish grounds for termination. **See** Father's Brief at 10. [6]

_____

with the provisions of this paragraph (b)(4) are waived." Pa.R.A.P. 1925(b)(4)(vii). However, as with Mother, we decline to find waiver because Father's challenge to (a)(1) is derivative of the two broad issues included in his concise statement, so our appellate review was not impeded.

[6] We note that Father does not specifically analyze the separate elements of any of the Section 2511(a) subsections, including (a)(1), and instead, simply makes general assertions in his argument section. In fact, Father does not even cite the language of any of the Section 2511(a) subsections in his argument beyond a broad assertion that he had not evidenced a settled purpose of relinquishing his rights to the Child. Thus, we would have cause to find Father's first issue waived due to lack of proper development. **See,**

*(Footnote Continued Next Page)*

Father claims he sought treatment to get his substance abuse issues under control. *Id.* According to Father, this Court must recognize that the medical emergency in December 2024, where both parents were hospitalized from their drug use, was a turning point for him, and he realized that he did not want the Child to grow up without Father and Mother. *Id.* Father asserts that the orphans' court failed to examine and acknowledge his justifications and failed to acknowledge his efforts at receiving substance abuse treatment. *Id.* Father also claims that he and Mother did not fail or refuse to care for the Child, they just lacked the wherewithal to do so at the time. *Id.* at 11. Lastly, Father asserts that he has not evidenced any settled purpose of relinquishing his rights to the Child. *Id.*

Father's argument fails to appreciate the standard of review we must apply in termination cases and is belied by the record.

Our review of the record supports the orphans' court's decision. We again note that the relevant six-month statutory period under Section 2511(a)(1) was from August 2024 to February 2025. During that timeframe, Father, like Mother, had no contact with the Agency or the Child. Specifically, throughout the life of the case before the termination petition was filed, Father

_____

*e.g., M.Z.T.M.W.*, 163 A.3d at 465 ("It is well-settled that this Court will not review a claim unless it is developed in the argument section of an appellant's brief, and supported by citations to relevant authority." (citation omitted)). Nevertheless, we decline to do so, because our appellate review was not impeded.

never contacted the Agency about his reunification goals or to ask about the Child, even though the Agency attempted to reach him. *See* N.T. at 35-36, 42, 46. Father never visited with the Child during that period; his last visit was in October 2023 while the Child was in the hospital. *See id.* at 36, 42, 45, 47-48, 64. Father did not attend the Child's adjudication hearing or any permanency review hearings. *See id.* at 13, 32, 37, 43. The permanency review orders entered in this case found that Father had no compliance with the permanency plan and had made no progress toward alleviating the circumstances which necessitated the original placement. *See* Recommendations – Permanency Review, 3/19/24, 9/12/24, 2/25/25. In fact, as noted above, aggravated circumstances were granted for both parents in September 2024 because they had no contact with the Child for six months. *See* N.T. at 43.

Additionally, Father did not comply with any of his court-ordered recommendations. The only time Father submitted a urine screen was at the beginning of this case before the relevant six-month period, and it was insufficient, so it did not qualify as a drug screen. *See id.* at 22. Otherwise, Father did not submit urine screens. *See id.* at 9, 35, 41, 46, 48. Father never contacted the Agency to notify them of any changes in his address or contact information. *See id.* at 35-36, 42, 46. Because Father had no contact with the Agency, it could not confirm his housing or income. *See id.* at 36, 42, 48.

Essentially, Father did absolutely nothing during the six-month period. He did not visit or have any other contact with the Child, and he never even reached out to the Agency to ask about the Child. In fact, it was Mother, not Father, who reached out to the Agency in March 2025, after the termination petition was filed, which was the first time the Agency had heard from Mother since March 2024. *See id.* at 48-49. The Agency then reached out to Father. *See id.* at 50. Father had the opportunity to visit with the Child in March 2025, but he did not communicate with the Agency in time to confirm the visit. *See id.* at 82-84. Father was then scheduled to have a visit in April 2025, but the Child was sick, so the visit was canceled. *See id.* at 50-51. Thus, as of the termination hearing in April 2025, Father had not visited the Child since October 2023. *See id.* at 64-66. He had a visit scheduled for the Wednesday after the hearing, but as that was after the termination petition was filed, it cannot be considered. *See id.* at 66; 23 Pa.C.S.A. § 2511(b).

Relevant to (a)(1), Father had no post-abandonment contact with the Child. Moreover, Father did not testify at the termination hearing, and, thus, he did not provide any explanation for his conduct. *See Z.S.W., supra*. The Agency caseworker testified that she was aware that Father had been employed for about a month and a half, and that Father had been in treatment for about a week as of the termination hearing. *See* N.T. at 63-64. However, again, these efforts were post-termination petition and cannot be considered. As for Father's other treatment, the caseworker testified that she was aware

Father had gone through rehabilitation but did not know the details of his treatment. *See id.* Father did not reach out to the Agency at any point during the relevant six-month period to provide information about his treatment.

Thus, under the totality of the circumstances, competent evidence supported the orphans' court's conclusion that Father evidenced a settled purpose of relinquishing his parental claim to the Child or refused or failed to perform parental duties for the six-month statutory period. *See A.M.*, 256 A.3d at 1270–71 (noting that "where a child is in foster care, a parent has the affirmative duty to work towards the return of the child by cooperating with the Agency to obtain the rehabilitative services necessary for [him] to be capable of performing [his] parental duties and responsibilities." (citation omitted)); *B.,N.M.*, 856 A.2d at 855 (noting that "the parental obligation is a positive duty which requires affirmative performance" and parental "rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with [the child's] physical and emotional needs." (citations omitted)). We discern no error of law or abuse of discretion with the orphans' court's decision under Section 2511(a)(1).

We turn next to Section 2511(b), and we incorporate our standard of review under this section as discussed above. Here, as explained above, the orphans' court concluded that terminating Father's parental rights would best serve the Child's needs and welfare.

On appeal, Father argues that he loves the Child. Father's Brief at 12. He asserts that many of the barriers he encountered when trying to reunify with the Child were undermined by substance abuse problems. *Id.* Father claims that he never abandoned the Child and continued to be fiercely devoted to him. *Id.* According to Father, the emotional toll termination will take on the Child should not be underestimated. *See id.*

Father's argument again fails to appreciate the standard of review we must apply in termination cases and is belied by the record.

As noted above, Section 2511(b) focuses on the child, not on the parent. *See C.M.K., supra*. Thus, Father's arguments that he loves the Child, never abandoned him, and continued to be fiercely devoted to him are unavailing under a Section 2511(b) analysis. As with Mother, we do not minimize the impact substance abuse can have on a parent, but courts "must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly." *K.T.*, 296 A.3d at 1108 (citing *T.S.M.*, 71 A.3d at 269) (emphasis omitted). Father's argument yields no relief.

Further, Father makes no cogent argument that he has any type of bond with the Child, nor could he convincingly make that argument. Father visited with the Child four times in October 2023 while the Child was in the hospital. *See* N.T. at 15. As of the termination hearing in April 2025, Father had not yet visited the Child again. By that time, the Child was over eighteen-months

old and had not seen Father since he was less than a month old. Thus, there was no evidence of any bond between Father and the Child. *See C.P.D.*, 324 A.3d at 27 ("In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists." (citation omitted)).

We incorporate our above discussion of the Child's foster family. The Child's foster family began visiting him when he was still in the hospital, and he has lived with them since he was released. *See* N.T. at 16, 28, 51, 73. The Child is now extremely bonded with his foster parents and siblings. *See id.* at 51-53, 74-76, 80. The Child's foster family takes care of all his needs and are an adoptive resource for him. *See id.* at 52-53, 76-77, 87. The Child refers to his foster parents as "mommy" and "daddy." *See id.* at 68, 77. The Child also has consistent visits with his older sibling. *See id.* at 40, 44, 67. The Agency caseworker testified that the Child needed permanency, and it was her opinion that parental rights should be terminated. *See id.* at 68-69. Similarly, the case manager recommended that the Child stay with his foster family. *See id.* at 80. Thus, the record supports the orphans' court's decision. We discern no error of law or abuse of discretion in the orphans' court's termination of Father's parental rights under Section 2511(b).

In sum, we hold that the orphans' court did not abuse its discretion or commit an error of law in terminating Mother's and Father's parental rights pursuant to Section 2511 of the Adoption Act.

Decrees affirmed.


Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary


Date: 2/11/2026